

PAUL D. SCOTT, ESQ.
California State Bar # 145975
LAW OFFICES OF PAUL D. SCOTT
201 Filbert, Suite 401
San Francisco, California 94133
Tel: (415) 981-1212
Fax: (415) 981-1215

Attorney for Relator
Jerry H. Brown II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTHERN DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA ex rel. ) No. 04 4424
JERRY H. BROWN II. )
                                                 ) **COMPLAINT**
                    Plaintiffs, )
                                               ) **DEMAND FOR JURY TRIAL**
          v. )
                                                 ) ~~FILED UNDER SEAL~~
APL LIMITED, NOL GROUP, and Does 1-50, )
                  Defendants. )
)

## JURISDICTION AND VENUE

1. This action is brought under the False Claims Act ("FCA" or "Act"), 31 U.S.C. § 3729 et seq., by plaintiff/relator Jerry H. Brown II ("relator") on behalf of the United States of America, under the qui tam provisions of the Act.

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 28 U.S.C. § 1345, for the United States is a party to this matter and the causes of action set forth herein are founded upon a law of the United States of America.

3. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732, for the defendants conduct business in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

4. Defendant APL Limited (aka "American President Lines") (hereinafter "APL") is a corporation with its principal offices in the United States located in Oakland, California. APL is one

of the world's largest container transportation companies.

5. Defendant NOL Group (aka Neptune Orient Lines) (referred to hereinafter as "NOL") is a business organization of unknown type headquartered in Singapore. At all times relevant referenced herein, defendant APL Limited was a wholly owned subsidiary of NOL.

6. The true names and capacities of the defendants named above as DOES 1 through 50, inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the names and capacities of such defendants, together with any additional charging allegations, at such time as they are ascertained.

7. Relator is informed and believes that at all times relevant herein, NOL dominated, directed and controlled the operations of APL Limited. Relator is further informed and believes that NOL Group authorized and approved the conduct set forth herein.

8. Plaintiff and relator Jerry H. Brown ("relator") is a Documentation Controller in Defendant APL's Denver Customer Service Center. He has held this position between April 1998 and the present. While employed by defendant APL, relator Brown's responsibilities have included documentation and billing for services provided by APL on behalf of the United States Department of Defense ("DoD").

9. This action by relator Brown on behalf of the United States is not based upon a "public disclosure" as defined by 31 U.S.C. § 3730(e)(4)(A). Relator has direct and independent knowledge of the conduct alleged herein and voluntarily disclosed that information to the United States before filing this complaint. Even if there were a public disclosure in this case, relator would thus qualify as an "original source" as defined by 31 U.S.C. § 3730(e)(4)(A).

## CONTRACTUAL BACKGROUND

10. Between at least 1994 and the present, defendant APL has provided shipping services on behalf of DoD. Such services have included, inter alia, the transportation of containers by cargo vessel to and from various ports in countries all around the world and the pickup and transport of such containers at inland locations within those same countries. Since 2001, the points of destination served by APL have included, but not been limited to, Kuwait, Afghanistan and Pakistan.

The vast majority of material transported by APL for DoD has been transported in containers.

Contract 0165

11. In or around February 2, 2001, the Department of Defense issued Solicitation No. DAMT01-00-R-0056. APL responded to the solicitation and, on or about September 1, 2001, entered into Contract No. DAMT01-01-D-0165 (hereinafter Contract No. 0165) with the Military Traffic Management Command ("MTMC"). On January 1, 2004, MTMC changed its name to the Surface Deployment and Distribution Command ("SDDC"). The current acronym "SDDC" is used herein to refer to both MTMC and SDDC.

12. Contract 0165 covered September 1, 2001 through August 31, 2002 and was later extended to February 28, 2003. The contract provided for the transportation of goods by APL on behalf of DoD to various locations around the world. It incorporated the terms of Universal Services Contract 03 ("USC-03"), which DoD also incorporated into its contracts with other ocean transport service providers. The contract set forth, inter alia, the destinations to be served, the various services to be provided, and the "accessorial" rates applicable for certain services, including local transportation of containers.

13. The Rate Rules section of Contract 0165 stated the following with respect to containers shipped under the contract: "General application: All rates included herein are based on Liner Terms." Contract No. 0165 at p. 64.

14. The Definition section of Contract No. 0165 defines the phrase "Liner Terms" as follows: "The Contractor assumes all responsibility and costs for the transportation of the cargo from the port or point where the cargo is receipted for by the Contractor to the destination port or point where the Contractor makes the cargo available to the consignee. . . . " Contract 0165, § 6.2, p. 49.

15. An initial accessorial rate was awarded to APL under Contract No. 0165 for transportation of goods from the port in Kuwait City to destinations within Kuwait City. The rate, which was set forth in Table 3E to the contract, was $115. The contract was later modified on or about May 13, 2002 by Modification P00075 to add an additional rate of $245 for deliveries by APL from the port in Shuaiba, Kuwait to Camp Doha.

3

16. Between at least September 1, 2001 and February 28, 2003, APL submitted invoices to SDDC for payment by the United States of the foregoing accessorial rates associated with its deliveries of cargo pursuant to Contract 0165. Included with the invoices submitted to the United States were Sea Waybills that generally identified the cargo transportation services provided and the rates charged for such services. These invoices were paid by the United States.

Contract 0129

17. In or around March 1, 2003, APL entered into Contract No. DAMT01-03-0129 (hereinafter Contract 0129) with SDDC, pursuant to Solicitation Number DAMT01-02-R-0066. The contract, which incorporated the terms of Universal Services Contract 04, provided for "[o]cean and intermodal transportation services for all DoD shippers worldwide (container/breakbulk) for one year base period of performance 01 Mar03 thru 29Feb 04" and contained an option for "01Mar04 thru 28Feb05." The contract set forth, inter alia, the destinations to be served, the various services to be provided, and the rate rules applicable for different services.

18. The Rate Rules for Contract 0129 stated the following with respect to containers shipped under the contract: "General application: All rates included herein are based on Liner Terms."

19. The Definition section of Contract 0129 defines the phrase "Liner Terms" as follows: "The Contractor assumes all responsibility and costs for the transportation of the cargo from the port or point where the cargo is receipted for by the Contractor to the destination port or point where the Contractor makes the cargo available to the consignee. . . ."

20. The rates paid to APL for ground transportation (linehaul/drayage) of containers in Kuwait under USC 04 were initially set forth in Table 3E attached to Contract 0129. The rates for "point to port" deliveries by APL within Kuwait ranged from $215 to $275, depending on the size of container and destination.

21. In or around March 16, 2003, Contract 0129 was modified pursuant to its Changes Clause and Modification No. P00004 to incorporate certain "ongoing rates" with APL into the contract. The effect of the modification was to increase the linehaul/drayage rates for certain point to point deliveries within Kuwait and also to increase the mileage rates for deliveries to destinations in

4

1  Kuwait not otherwise specifically covered by the modification. The new rates under the
2  modification ranged from $1,030 to $1,205, depending on the size of container and destination. For
3  deliveries 0-50 miles to other locations, the mileage rates were set at $1,115 for containers under 40
4  feet and at $1,205 for containers 40 feet and over. Additional amounts were to be paid for longer
5  deliveries.

6  22. Between at least March 2003 and January 2004, APL submitted invoices to SDDC for
7  payment by DoD at the accessorial rates set forth in Modification P0004 for deliveries of containers
8  within Kuwait Included with the invoices submitted to the United States were Sea Waybills that
9  generally identified the transportation services provided and the rates charged for such services.
10 These invoices were paid by the United States.

## DOUBLE-BILLING OF KTS CHARGES

12  23. Beginning in November 2003 and continuing to at least January 2004, APL
13  systematically billed SDDC directly for transportation-related charges that should already have been
14  covered by the accessorial rates being paid to APL under Contracts 0165 and 0129. These double-
15  billed charges covered the period of approximately August 2002 through December 2003 and were
16  ultimately paid by DoD.

17  24. The charges doubled-billed by APL were initially billed to APL by Kuwait
18  Transcontinental Shipping ("KTS"). During all relevant periods referenced herein, KTS provided
19  local ground transportation (linehaul/drayage) services on behalf of APL for containers delivered to
20  Kuwait. The following items were included in KTS's charges to APL for its services: 1) Custom's
21  Clearance, 2) Transport Charges, 3) Delivery Order Charge, 4) Port Gate Pass Charge, 5) Port
22  Landing Charges, 6) Port Handling Charges, 7) Port Storage Charges, and 8) Trailer Detention
23  Charges.

24  25. Most, if not all, of the foregoing costs, however, were associated with the transportation
25  of the cargo and thus were covered under the accessorial rates paid to APL under Contracts 0165 and
26  0129 (or modifications thereto) and thus should not have been separately billed to DoD.

27  26. In a May 18, 2003 e-mail regarding the KTS charges, APL Senior Finance Analyst Vivek

5

Sathe stated "[a]ctually out of the above we should be re-imbursed only towards" port handling, port storage, and trailer detention charges. In a June 17, 2003 e-mail on the same subject, Eric Mensing, APL's Vice President of Government Markets, indicated his general agreement with Mr. Sathe's conclusion, saying "[a]s discussed, many of these cannot be billed."

27. Despite the foregoing knowledge, APL has falsely billed DoD approximately $2.2 million for KTS charges and has not provided a credit to DoD for those charges. Relator is informed and believes that, instead, APL has simply created a reserve line in its books to account for the possibility that some or all of the double billed amount would have to be repaid. Relator is further informed and believes that APL also has other items on its reserve schedule that reflect additional improper charges to DoD.

### REEFER MAINTENANCE AND PLUG-IN CHARGES

28. Both Contracts 0165 and 0129 permitted APL, under specified circumstances, to charge SDDC a "reefer maintenance" charge to compensate APL for expenses associated with operating (i.e., powering) refrigerated containers. This charge was permitted after seven days of "free time" following the discharge of the containers from the delivering vessel.

29. Section 4.3.1.3.1 of both Contract Nos. 0165 and 0129 states as follows: "When the return of refrigerated containers to the Carrier is delayed by the Government beyond the allowable free time, the carrier may assess a reefer maintenance charge in addition to those charges for container detention. The reefer maintenance charge shall be added to the per diem detention charge when, due to Government delay, the carrier incurs additional expenses in maintaining operation of those refrigerated containers so delayed. The Carrier will certify such charges to the Contracting Officer."

30. The Contracts then identifies two categories of rates - Column A and Column B rates. The Column A rate for containers "20 feet and over" is $7.76 per 24 hour period or part thereof, the Column A rate for containers "40 feet and over" is $11.21. The Column B rate for containers "20 feet and over" is $29.90 per 24 hour period or part thereof, and the Column B rate for containers "40 feet and over" is $43.70. Column A rates are appropriate "when refrigerated containers are delayed

at those facilities where electrical power is available for direct connection to the Carrier's container." Column B rates are appropriate only "when refrigerated containers are delayed at those facilities where the Carrier is required to maintain operation of refrigerated containers without the use of electrical power." See Section 4.3.1..3.1.

31. APL has charged reefer maintenance fees to SDDC at either Column A or B rates (after the expiration of "free time") for all containers delivered to the Middle East and Pakistan/Afghanistan between at least January 2003 and the present. These invoices have been paid by SDDC.

Unsubstantiated Reefer Maintenance Charges

32. APL has assessed all of the foregoing reefer maintenance charges, despite lacking evidence, as required by the Contracts, of having incurred actual operating expenses for most of the relevant containers for the periods charged. APL lacks such evidence, because most of the containers have either not been operated at APL's expense for the entire period billed or simply not been operated at all.

33. APL routinely and systematically charged reefer maintenance fees for containers held by DoD, despite the fact that DoD was paying for the power or fuel used to operate the refrigerated containers. Similarly, APL routinely charged reefer maintenance fees to SDDC for containers in DoD's possession, without even verifying that the refrigeration equipment on the containers was being operated at all.

34. Relator is informed and believes that APL knowingly billed SDDC up to $4.2 million in false claims pursuant to the foregoing scheme, and SDDC has paid the claims.

Billing Incorrect Rate for Reefer Maintenance Charges in Pakistan/Afghanistan

35. As noted above, APL has lacked justification in many instances for the assessment of any reefer maintenance charges for containers delivered to the Middle East and Pakistan/Afghanistan between approximately January 2003 through the present. With respect to Pakistan and Afghanistan in particular, even in those cases where some charge was justified, the rate charged by APL has also been falsely inflated.

7

36. In Pakistan/Afghanistan, for the approximate period January 2003 through December 2003, APL charged Column B rates to SDDC for all containers in Karachi, Pakistan (after "free time" expired), even if the containers were still at the Port and power was available to operate the refrigeration units on the containers.

37. Since approximately January 2004 through the present, APL's practice has changed, and it has charged SDDC at Column A rates (after "free time") for containers at the Port in Karachi, Pakistan, and it has charged Column B rates for containers once they have left the Port for delivery to Afghanistan or elsewhere.

38. The Column B rates charged by APL to SDDC for containers held at the Port in Karachi were excessive and false, for power was available to APL in Karachi to operate the refrigerated containers.

39. The Column B rates charged by APL to SDDC for containers after they left the Port in Karachi were also generally false, for the vast majority of refrigerated containers associated with the charges did not have generators (aka "Gensets") on them which could potentially justify the assessment of Column B rates for the operation of the containers. As just one example, in September 2003, DoD was in possession of 77 of APL's refrigerated containers in Khandahar, Afghanistan, but only ten of the containers had Gensets. Nonetheless, APL charged Column B reefer maintenance rates for all 77 containers for the entire period they were held by DoD.

40. Relator is informed and believes that the vast majority of refrigerated containers delivered to Pakistan/Afghanistan by APL from January 2003 through the present did not have Gensets, yet they were billed to SDDC at the rate for containers with such equipment, and SDDC paid the claims. The amount overcharged pursuant to this scheme will be established at trial.

41. Relator is informed and believes that APL created a reserve on its books to account for the possibility that APL would be required to return funds to DoD as a result of APL charging excessive rates for reefer maintenance.

Double-Billing Plug-In Charges

42. In those cases where APL has actually incurred a "plug-in" charge for the operation of a

8

1  container, it has double-billed that amount to DoD.

2  43.    For example, when APL incurred a "plug-in charge" in connection with containers discharged at the port in Karachi, Pakistan between January 2003 and the present, it subsequently billed DoD directly for the cost of that expense. But, under the terms of Contracts 0129 and 0165, any such charges should already have been covered by the reefer maintenance rates also being billed by APL, for those rates were explicitly intended to compensate APL for the costs (such as plug-in charges) of operating the containers.

44.    The total amount double-billed by APL for plug-in charges at the Karachi Port for the period January 2003 through July 2004 is approximately $2.4 million.

Excessive Plug-In Charges

45.    In addition to double-billing for plug-in charges as described above, APL has also charged SDDC a higher amount for the plug-in charges in Karachi, Pakistan than the charges it was actually assessed by the port.

46.    For the period of approximately January 2003 through the present, APL has charged SDDC $60 per day for plug-in charges associated with the containers in Karachi, but that is not the rate that APL has paid. APL has negotiated a discount with the Port that allows it to pay a reduced rate (which may be as low as zero) based on the total number of containers (both military and commercial) on a particular vessel. This discount has not been passed on to SDDC. The amount overcharged pursuant to this scheme will be established at trial.

COUNT I
(Submission of False Claims in Violation of 31 U.S.C. § 3729(a)(1))
(All Defendants)

47.    Relator realleges and incorporates paragraphs 1 through 46 as if fully set forth herein.

48.    By engaging in the conduct described herein, defendants have knowingly submitted, or caused to be submitted to DoD claims for payment which were false.

49.    Defendants thus knowingly caused the submission of false claims to the United States in violation of the False Claims Act. The United States was damaged by such false claims in an exact amount to be established at trial.

9

## COUNT II
### (Use of False Statements or Records or Statements in Violation of 31 U.S.C. § 3729(a)(2))
### (All Defendants)

50. Relator realleges and incorporates paragraphs 1 through 46 as if fully set forth herein.

51. By engaging in the conduct described above, defendants knowingly participated in the submission of false records and/or statements to the United States regarding services and the cost of services being provided by APL to DoD.

52. Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act. The United States was damaged by such false claims in an exact amount to be established at trial.

## COUNT III
### (Reverse False Claims - 31 U.S.C. § 3729(a)(7))
### (All Defendants)

53. Relator realleges and incorporates paragraphs 1 through 46 as if fully set forth herein.

54. By engaging in the conduct described above, defendants avoided or reduced obligations owed to the United States.

55. When seeking additional payments from DoD, following the improper receipt of funds described above, defendants knowingly concealed information concerning the offsetting reimbursements that were owed to DoD and thus reduced defendants' obligation to the United States.

56. Defendants thus knowingly used false records or statements to reduce or avoid an obligation to pay the United States in violation of the False Claims Act. The United States was damaged by such false claims in an exact amount to be established at trial.

WHEREFORE, plaintiffs/relator pray for judgment against defendants as follows:

1. On Count I (Submission of False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages established at trial, penalties of $11,000 for each false claim, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

2. On Count II (Use of False Statements or Records), an order holding each of the defendants individually and jointly liable for treble the single damages established at trial, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

3. On Count III (Reverse False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages established at trial, penalties of $11,000 for each false statement or claim, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

4. For the payment of reasonable attorney's fees, costs, and expenses as provided by the False Claims Act.

Dated: October 9, 2004                         LAW OFFICES OF PAUL D. SCOTT

                                               BY: _____
                                                   PAUL D. SCOTT
                                                   Attorney for Relator Brown

## JURY DEMAND

Relator Brown hereby demands trial by jury.