1  PAUL D. SCOTT, ESQ.
   California State Bar # 145975
2  LAW OFFICES OF PAUL D. SCOTT
   201 Filbert, Suite 401
3  San Francisco, California 94133
   Tel: (415) 981-1212
4  Fax: (415) 981-1215

5  Attorney for Relator
   Jerry H. Brown II
6

7              IN THE UNITED STATES DISTRICT COURT

8       FOR THE DISTRICT OF NORTHERN DISTRICT OF CALIFORNIA

9
   THE UNITED STATES OF AMERICA ex rel. )    NO. C04-4424 MEJ
10 JERRY H. BROWN II.                    )
                                         )
11             Plaintiffs,               )    **FIRST-AMENDED COMPLAINT**
                                         )
12             v.                        )    **DEMAND FOR JURY TRIAL**
                                         )
13 APL LIMITED, NOL GROUP, MAERSK        )
   LINE, LIMITED, A.P. MOLLER - MAERSK   )    ~~FILED UNDER SEAL~~
14 GROUP, and Does 3-50,                 )
                                         )
15                                       )
               Defendants.               )
16 ─────────────────────────────────────

17

18              JURISDICTION AND VENUE

19     1.    This action is brought under the False Claims Act ("FCA" or "Act"), 31 U.S.C.

20 § 3729 et seq., by plaintiff/relator Jerry H. Brown II ("relator") on behalf of the United States of

21 America, under the qui tam provisions of the Act.

22
       2.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 28 U.S.C.
23

24 § 1345, for the United States is a party to this matter and the causes of action set forth herein are

25 founded upon a law of the United States of America.

26     3.    Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732, for
27
   the defendants conduct business in this District, and a substantial part of the events or omissions
28

1  giving rise to the claims occurred in this District.

2  PARTIES

3
4    4.  Defendant APL Limited  (aka "American President Lines") (hereinafter "APL") is a

5  corporation with its principal offices in the United States located in Oakland, California.  APL is one

6  of the world's largest container transportation companies.

7    5.  Defendant NOL Group (aka Neptune Orient Lines) (referred to hereinafter as "NOL") is a

8  business organization of unknown type headquartered in Singapore.  At all times relevant referenced

9
10  herein, defendant APL Limited was a wholly owned subsidiary of NOL.  Relator is informed and

11  believes that at all times relevant herein, NOL dominated, directed and controlled the operations of

12  APL Limited.  Relator is further informed and believes  that NOL authorized and approved the

13  conduct of APL set forth herein.

14    6.  Defendant MAERSK LINE, LIMITED ("Maersk Line") is a corporation with

15
16  headquarters located in Norfolk, Virginia and operations at locations throughout the United States.

17  Relator is informed and believes that Maersk Line provides shipping services out of the port in

18  Oakland, California.

19    7.  Defendant A.P. MOLLER - MAERSK GROUP ("A.P. Moller - Maersk") is a business

20
21  organization of unknown type, which has offices throughout the United States, including San

22  Francisco. Relator is informed and believes that, at all times relevant referenced herein, defendant

23  Maersk Line was a wholly owned subsidiary of A.P. Moller - Maersk, that defendant Maersk Line

24  was dominated and controlled by A.P. Moller - Maersk, and that A.P. Moller - Maersk authorized

25  and approved the conduct by Maersk Line set forth herein

26
27
28                                          2

1    8.   The true names and capacities of the defendants named above as DOES 3 through 50,

2   inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the

3
    names and capacities of such defendants, together with any additional charging allegations, at such
4

5   time as they are ascertained.

6    9.   Plaintiff and relator Jerry H. Brown ("relator") is a Documentation Controller in

7   Defendant APL's Denver Customer Service Center.  He has held this position between April 1998

8   and the present.   While employed by defendant APL, relator Brown's responsibilities have included
9
    documentation and billing for services provided by APL on behalf of the United States Department
10

11   of Defense ("DoD").

12   10.   This action by relator Brown on behalf of the United States is not based upon a

13   "public disclosure" as defined by 31 U.S.C. § 3730(e)(4)(A).  Relator has direct and independent

14   knowledge of the conduct alleged herein and voluntarily disclosed that information to the United
15
    States before filing this complaint.  Even if there were a public disclosure in this case, relator would
16

17   thus qualify as an "original source" as defined by 31 U.S.C. § 3730(e)(4)(A).

18                              CONTRACTUAL BACKGROUND

19   11.   Defendants provide shipping services on behalf of DoD.  Their services include, inter

20   alia, the transportation of containers by cargo vessel to and from various ports in countries all around
21
    the world and the pickup and transport of such containers to inland locations within those same
22

23   countries.  Since 2001, the points of destination served by defendants have included, but not been

24   limited to, Kuwait, Afghanistan and Pakistan.  The vast majority of material transported by

25   defendants for DoD has been transported in containers.

26

27

28                                       3

USC-03

12.     In or around February 2, 2001, the Department of Defense issued Solicitation No. DAMT01-00-R-0056.  APL responded to the solicitation and, on or about September 1, 2001, entered into Contract No. DAMT01-01-D-0165 (hereinafter Contract No. 0165) with the Military Traffic Management Command ("MTMC").   (On January 1, 2004, MTMC changed its name to the Surface Deployment and Distribution Command ("SDDC").   The current acronym "SDDC" is used herein to refer to both MTMC and SDDC).

13.     APL's Contract 0165 covered September 1, 2001 through August 31, 2002 and was later extended to February 28, 2003.   The contract provided for the transportation of goods by APL on behalf of DoD to various locations around the world.   Contract 0165 incorporated the terms of Universal Services Contract 03 ("USC-03").   USC-03 set forth, inter alia, the destinations to be served, the various services to be provided, and the rates applicable for certain services, including local transportation of containers.

14.     On or about the same date that APL entered into Contract 0165, Maersk entered into the same basic contract with DoD, which also incorporated the terms of USC-03 and covered the same period of time, just under a different contract number.

15.     Per the terms of USC-03, and modifications thereto, APL and Maersk agreed to deliver containers from various ports in the Middle East, Pakistan, and Afghanistan to inland locations at specified linehaul/drayage rates.   These rates were designed to cover costs associated with the delivery of containers from ports of discharge to inland locations, with the possible exception of costs associated with port handling, port storage, and trailer detention.

16.     The linehaul/drayage rates for deliveries from ports in Kuwait to destinations inside

4

1   Kuwait were set forth in Table 3E to USC-03 and initially ranged from $115 to $315.

2       17.     Between approximately September 1, 2001 and February 28, 2003, APL and Maersk
3
4   submitted or caused to be submitted invoices to SDDC for payment by the United States at the

5   foregoing rates associated with their deliveries of cargo pursuant to USC-03. Included with the

6   invoices submitted to the United States were Sea Waybills that generally identified the cargo

7   transportation services provided and the rates charged for such services. APL's invoices were paid

8   by the United States. Relator is informed and believes that Maersk's invoices were also paid by the
9
10  United States.

11      USC-04

12      18.     In or around March 1, 2003, APL entered into Contract No. DAMT01-03-0129

13  (hereinafter Contract 0129) with SDDC, pursuant to Solicitation Number DAMT01-02-R-0066. The

14  contract, which incorporated the terms of Universal Services Contract 04, provided for "[o]cean and
15
16  intermodal transportation services for all DoD shippers worldwide (container/breakbulk) for one year

17  base period of performance 01 Mar03 thru 29Feb 04" and contained an option for "01Mar04 thru

18  28Feb05." The contract set forth, inter alia, the destinations to be served, the various services to be

19  provided, and the rate rules applicable for different services. The contract was extended pursuant to
20
21  the option in the contract, then later extended again to August 2005 and again to December 2005.

22      19.     On or about the same date that APL entered into Contract 0129, Maersk entered into the

23  same basic contract with DoD, which also incorporated the terms of USC-04 and covered the same

24  period of time, just under a different contract number.

25      20.     Per the terms of USC-04, and modifications thereto, APL and Maersk agreed to deliver
26
27  containers from various ports in the Middle East, Pakistan, and Afghanistan to inland locations at

28                                                  5

specified linehaul/drayage rates. These rates were intended to cover all costs associated with the deliveries, with the possible exception of port handling, port storage, and trailer detention charges.

21. The linehaul rates for deliveries from ports in Kuwait to destinations inside Kuwait were set forth in Table 3E to USC-04 and initially ranged from $115 to $315, depending on the company, the size and type of container, and the destination within Kuwait. Between approximately March 1, 2003 and the present, APL and Maersk have billed DoD at the rates associated with their deliveries of cargo pursuant to USC-04 and any modifications thereto. Included with the invoices submitted to the United States were Sea Waybills that generally identified the cargo transportation services provided and the rates charged for such services. APL's invoices were paid by the United States. Relator is informed and believes that Maersk's invoices were also paid by the United States.

22. In or around March 16, 2003, APL's Contract 0129 was modified pursuant to its Changes Clause and Modification No. P00004 to incorporate certain "ongoing rates" into the contract. The effect of the modification was to increase the linehaul/drayage rates for certain point to port deliveries within Kuwait and also to increase the mileage rates for deliveries to destinations in Kuwait not otherwise specifically covered by the modification. The new rates under the modification ranged from $1,030 to $1,205, depending on the size of container and destination. For deliveries 0-50 miles to other locations, the mileage rates were set at $1,115 for containers under 40 feet and at $1,205 for containers 40 feet and over. Additional amounts were to be paid for longer deliveries.

23. Between approximately March 2003 and January 2004, APL submitted or caused to be submitted invoices to SDDC for payment by DoD at the modified rates for deliveries of containers within Kuwait Included with the invoices submitted to the United States were Sea Waybills that

6

generally identified the transportation services provided and the rates charged for such services. These invoices were paid by the United States.

## COORDINATION AMONG CARRIERS

24.    Since at least October 2003 and possibly earlier, APL and Maersk have engaged in a knowing and intentional practice of coordinating their billing practices with and amongst each other, with the manifest intention of not raising questions by DoD about such practices, including those described herein.

25.    Eileen Murphy, relator's immediate superior at APL, and others in APL's management have made repeated comments to Mr. Brown about the need to coordinate various specific charging practices with Maersk. Similar comments have been made to Mr. Brown by his superiors that indicate coordination of billing practices has routinely taken place amongst APL and Maersk.

## DOUBLE-BILLING OF KTS CHARGES

26.    Beginning in November 2003 and continuing to at least January 2004, APL systematically billed SDDC directly for transportation-related charges that should already have been covered by the rates being paid to APL under Contracts 0165 and 0129. These double-billed charges covered the period of approximately August 2002 through December 2003 and were ultimately paid by DoD.

27.    The charges doubled-billed by APL were initially billed to APL by Kuwait Transcontinental Shipping ("KTS"). During all relevant periods referenced herein, KTS provided local ground transportation (linehaul/drayage) services on behalf of APL for containers delivered to Kuwait. The following items were included in KTS's charges to APL for its services: 1) Custom's Clearance, 2) Transport Charges, 3) Delivery Order Charge, 4) Port Gate Pass Charge, 5) Port

7

Landing Charges, 6) Port Handling Charges, 7) Port Storage Charges, and 8) Trailer Detention Charges.

28.    Most, if not all, of the foregoing costs, however, were associated with the transportation of the cargo and thus were covered under the linehaul/drayage rates paid to APL under Contracts 0165 and 0129 (or modifications thereto) and thus should not have been separately billed to DoD.

29.    In a May 18, 2003 e-mail regarding the KTS charges, APL Senior Finance Analyst Vivek Sathe stated "[a]ctually out of the above we should be reimbursed only towards" port handling, port storage, and trailer detention charges. In a June 17, 2003 e-mail on the same subject, Eric Mensing, APL's Vice President of Government Markets, indicated his general agreement with Mr. Sathe's conclusion, saying "[a]s discussed, many of these cannot be billed."

30.    Despite the foregoing knowledge, APL has falsely billed DoD approximately $2.2 million for KTS charges and has not provided a credit to DoD for those charges. Relator is informed and believes that, instead, APL has simply created a reserve line in its books to account for the possibility that some or all of the double billed amount would have to be repaid.  Relator is informed and believes that APL also has other items on its reserve schedule that reflect additional improper charges to DoD.

31.    Like APL, Maersk has billed SDDC for the same KTS charges referred to above, which should properly have been covered by the linehaul/drayage rates already being paid to Maersk under the terms of USC-03 and USC-04. Relator is informed and believes that Maersk has followed this practice since at least August 2002 through the present.

## REEFER MAINTENANCE AND PLUG-IN CHARGES

32.    Both USC-03 and USC-04 permitted APL and Maersk, under specified circumstances, to

8

charge SDDC a "reefer maintenance" charge to compensate them for expenses associated with operating (i.e., powering) refrigerated containers.  This charge was permitted  after seven days of "free time" that is supposed to commence when containers are available for delivery and/or unstuffing.

33.     Section 4.3.1.3.1 of both USC-03 and USC-04 states as follows: "When the return of refrigerated containers to the Carrier is delayed by the Government beyond the allowable free time, the carrier may assess a reefer maintenance charge in addition to those charges for container detention.   The reefer maintenance charge shall be added to the per diem detention charge when, due to Government delay, the carrier incurs additional expenses in maintaining operation of those refrigerated containers so delayed.  The Carrier will certify such charges to the Contracting Officer."

34.     The contracts then identify two categories of rates - Column A and Column B rates.  The Column A rate for containers "20 feet and over" is $7.76 per 24 hour period or part thereof, the Column A rate for containers "40 feet and over" is $11.21.  The Column B rate for containers "20 feet and over" is $29.90 per 24 hour period or part thereof, and the Column B rate for containers "40 feet and over" is $43.70.  Column A rates are appropriate "when refrigerated containers are delayed at those facilities where electrical power is available for direct connection to the Carrier's container." Column B rates are appropriate only "when refrigerated containers are delayed at those facilities where the Carrier is required to maintain operation of refrigerated containers without the use of electrical power."  See Section 4.3.1..3.1.

35.     APL has charged reefer maintenance fees to SDDC at either Column A or B rates (after the expiration of "free time" as calculated by APL) for all containers delivered to the Middle East and Pakistan/Afghanistan between at least January 2003 and the present.  These invoices have been

9

1  paid by SDDC through December 2004.

2  36.    Maersk has similarly charged reefer maintenance charges to SDDC (after the expiration

3
4  of "free time" as calculated by Maersk) for all containers delivered to the Middle East and

5  Pakistan/Afghanistan between at least January 2003 and the present. Relator is informed and

6  believes that these invoices have been paid by SDDC.

7  Unsubstantiated Reefer Maintenance Charges

8  37.    APL has assessed the foregoing reefer maintenance charges, despite lacking evidence, as
9
10 required by the terms of USC-03 and USC-04, of having incurred actual operating expenses for most

11 of the relevant containers for the periods charged. APL lacks such evidence, because most of the

12 containers have either not been operated at APL's expense for the entire period billed or simply not

13 been operated at all.

14 38.    Between at least January 2003 and the present, APL routinely and systematically charged
15
16 reefer maintenance fees for containers held by DoD, despite the fact that DoD was paying for the

17 power or fuel used to operate the refrigerated containers. Similarly, during the same period, APL

18 routinely charged reefer maintenance fees to SDDC for containers in DoD's possession, without

19 even verifying that the refrigeration equipment on the containers was being operated at all.

20 39.    Relator is informed and believes that APL knowingly billed SDDC in excess of $6
21
22 million in false claims pursuant to the foregoing scheme, and SDDC has paid the claims.

23 40.    Between at least January 2003 and the present, Maersk has also billed reefer maintenance

24 to SDDC for containers held by DoD, despite the fact that DoD was paying for the power or fuel

25 used to operate the refrigerated containers. Relator is informed and believes that, during the same

26 period, Maersk routinely charged reefer maintenance fees to SDDC for containers in DoD's
27

28                                              10

1  possession, without even verifying that the refrigeration equipment on the containers was being

2  operated at all. The total amount of paid claims is unknown to relator but is estimated at more than

3  $10 million.

4

5  Billing Incorrect Rate for Reefer Maintenance Charges in Pakistan/Afghanistan

6  41.    As noted above, APL and Maersk lacked justification in many instances for the

7  assessment of any reefer maintenance charges for containers delivered to the Middle East and

8  Pakistan/Afghanistan between approximately January 2003 through the present. With respect to

9  Pakistan and Afghanistan in particular, even in those cases where some charge was justified, the rate

10  charged by APL and Maersk has also been falsely inflated.

11

12  42.    In Pakistan/Afghanistan, for the approximate period January 2003 through December

13  2003, APL charged Column B rates to SDDC for all containers in Karachi, Pakistan (after the

14  expiration of "free time" as calculated by APL), even if the containers were still at the Port and

15  power was available to operate the refrigeration units on the containers.

16

17  43.    Since approximately January 2004 through the present, APL's practice has changed, and

18  it has charged SDDC at Column A rates (after "free time") for containers at the Port in Karachi,

19  Pakistan, and it has charged Column B rates for containers once they have left the Port for delivery

20  to Afghanistan or elsewhere.

21

22  44.    The Column B rates charged by APL to SDDC for containers held at the Port in Karachi

23  were excessive and false, for power was available to APL in Karachi to operate the refrigerated

24  containers.  These amount of these overcharges was calculated and acknowledged internally at APL,

25  but they were not refunded to the Government.

26

27  45.    The Column B rates charged by APL to SDDC for containers after they left the Port in

28  11

Karachi were also generally false, for the vast majority of refrigerated containers associated with the charges did not have generators (aka "Gensets") on them which could potentially justify the assessment of Column B rates for the operation of the containers. As just one example, in September 2003, DoD was in possession of 77 of APL's refrigerated containers in Khandahar, Afghanistan, but only ten of the containers had Gensets. Nonetheless, APL charged Column B reefer maintenance rates for all 77 containers for the entire period they were held by DoD.

46. Relator is informed and believes that the vast majority of refrigerated containers delivered to Pakistan/Afghanistan by APL from January 2003 through the present did not have Gensets, yet they were billed to SDDC by APL at the rate for containers with such equipment, and SDDC paid the claims. The amount overcharged pursuant to this scheme will be established at trial.

47. Relator is informed and believes that APL created a reserve on its books to account for the possibility that APL would be required to return funds to DoD as a result of APL charging excessive rates for reefer maintenance.

48. Like APL, Maersk charged DoD at Column B rates for most, if not all, of the refrigerated containers delivered to Pakistan/Afghanistan by Maersk. Relator is informed and believes that this practice began in approximately January 2003 (and perhaps earlier) and has continued through the present. Maersk has charged Column B rates from at least the expiration of the freetime period up through the date that the containers have been returned to Maersk. These rates have been charged even when containers have been in the Government's possession, and the Government has been paying to power the containers at its own facility. Relator is informed and believes that Maersk has also, at times, charged Column B rates, after the expiration of freetime, even when containers were at port and power was available to plug-in the containers.

12

Double-Billing Plug-In Charges

49.     In those cases where APL has actually incurred a "plug-in" charge for the operation of a container, it has double-billed that amount to DoD.

50.     For example, when APL incurred a "plug-in charge" in connection with containers discharged at the port in Karachi, Pakistan between January 2003 and the present, it subsequently billed DoD directly for the cost of that expense.  But, under the terms of Contracts 0129 and 0165, any such charges should already have been covered by the reefer maintenance rates also being billed by APL, for those rates were explicitly intended to compensate APL for the costs (such as plug-in charges) of operating the containers.

51.     The total amount double-billed by APL for plug-in charges at the Karachi Port for the period January 2003 through December 2004 is approximately $6.15 million.

52.     Relator is informed and believes that Maersk has followed the same practice of billing DoD for "plug-in" charges as described above between January 2003 and the present.  The exact amount of such charges is unknown to relator but is estimated to be in excess of $5 million.

Excessive Plug-In Charges

53.     In addition to double-billing for plug-in charges as described above, APL has also charged SDDC a higher amount for the plug-in charges in Karachi, Pakistan than the charges it was actually assessed by the port.

54.     For the period of approximately January 2003 through the present, APL has charged SDDC $60 per day for plug-in charges associated with the containers in Karachi, but that is not the rate that APL has paid.  APL has negotiated a discount with the Port that allows it to pay a reduced rate (which may be as low as zero) based on the total number of containers (both military and

13

commercial) on a particular vessel. This discount has not been passed on to SDDC. The amount overcharged pursuant to this scheme will be established at trial.

## FREE TIME

55.   APL and Maersk were entitled under USC-03 and USC-04 to charge detention and reefer maintenance under specified circumstances in connection with particular containers only after a period of "freetime" associated with each particular container had ended.

56.   Both USC-03 and USC-04 contain specific provisions that define the concept of "Freetime."

57.   Section 4.3.1.3.1 states as follows: "Performance Objective No. 35 – The contractor must provide 7 days freetime, excluding Saturdays/Sundays and holidays form containers/chassis except as indicated below. Freetime will run for any delays caused by the Government. Freetime will commence at 0001 hours on the first working day the container is available for delivery and/or unstuffing. When freetime is exceeded, contractors will be paid at detention rates and for reefer maintenance as stated below."

58.   Containers are not "available for delivery and/or unstuffing" until at least after they have been customs cleared or later (e.g., when APL was able to deliver the containers). Nonetheless, despite the foregoing clear contract language, during the time-frame covered by USC-03 and USC-04 (i.e., approximately September 2001 through the present), APL has not commenced its calculation of freetime at the point when containers have cleared customs or later. APL has commenced its calculation of "freetime" upon the date that containers have been discharged from arriving vessels, regardless of whether the Government caused the delay. This practice is inconsistent with how APL has calculated freetime for deliveries on behalf of DoD to the United

14

1  States. In this, and other contexts, APL has demonstrated a knowledge of how to calculate freetime

2  correctly but has simply not done so in connection with deliveries to the Middle East, Afghanistan,

3  Pakistan, and possibly elsewhere.

4

5  59.  The consequence of APL starting the calculation of freetime from the date of discharge

6  has been to increase the amount it has been able to charge DoD for detention and reefer maintenance.

7  60.  The exact increase in the amount billed by APL to DoD for detention and reefer

8  maintenance as a result of APL's knowingly incorrect calculation of "freetime" is presently unknown

9  to relator but is presently estimated to be in excess of $10 million.

10

11  61.  Maersk has followed the same practice described above with respect to its method of

12  calculating free time. It also has started the calculation of freetime from the date of discharge, in

13  knowing violation of the terms of the contract. In addition, though, Maersk has also knowingly

14  miscalculated freetime by failing to exclude all Saturdays, Sundays and holidays from the calculation

15

16  of freetime, as required by the contract  Maersk has systematically provided eight days of freetime,

17  which is less than the amount required by the contract. Relator is informed and believes that Maersk

18  has followed the foregoing practices during the time period covered by USC-03 and USC-04 and that

19  the damages resulting from this practice are in excess of $10 million.

20

                                    OVERPAYMENTS

21

22  62.  In or around May and June 2004, APL submitted non-final versions of its invoices for

23  services to SDDC for March and April 2004, respectively, then later submitted final versions of the

24  same invoices, but SDDC processed the non-final versions of the invoices. The result was that APL

25  was overpaid by a total of $861,896.87 ($1,085,072.00 - $223,175.13 withheld by SDDC) for March

26  and April 2004. An additional overpayment of $162,546.62 was made by SDDC for May 2004. All

27

28                                        15

three overpayments are known to APL management, but APL has not advised the Government of the overpayments, reimbursed the funds, or credited the funds to date.

COUNT I

(Submission of False Claims in Violation of 31 U.S.C. § 3729(a)(1))

(All Defendants)

63.     Relator realleges and incorporates paragraphs 1 through 62 as if fully set forth herein.

64.     In engaging in the conduct described herein, defendants have knowingly submitted, or caused to be submitted to DoD claims for payment which were false.

65.     Defendants thus knowingly caused the submission of false claims to the United States in violation of the False Claims Act. The United States was damaged by such false claims in an exact amount to be established at trial.

COUNT II

(Use of False Statements or Records or Statements
in Violation of 31 U.S.C. § 3729(a)(2))

(All Defendants)

66.     Relator realleges and incorporates paragraphs 1 through 62 as if fully set forth herein.

67.     In engaging in the conduct described above, defendants knowingly participated in the submission of false records and/or statements to the United States regarding services, the cost of services being provided by defendants to DoD, and the allowability of costs submitted to DoD.

68.     Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act. The United States was damaged by such false claims in an exact amount to be established at trial.

## COUNT III
(Reverse False Claims - 31 U.S.C. § 3729(a)(7))
(All Defendants)

69.     Relator realleges and incorporates paragraphs 1 through 62 as if fully set forth herein.

70.     By engaging in the conduct described above, defendants avoided or reduced obligations owed to the United States.

71.     When seeking additional payments from DoD, following the improper receipt of funds described above, defendants knowingly concealed information concerning the offsetting reimbursements that were owed to DoD and thus reduced defendants' obligation to the United States.

72.     Defendants thus knowingly used false records or statements to reduce or avoid an obligation to pay the United States in violation of the False Claims Act. The United States was damaged by such false claims in an exact amount to be established at trial.

## COUNT VI
(Conspiracy to Get False Claims Paid - 31 U.S.C. § 3729(a)(3))
(All Defendants)

73.     Relator realleges and incorporates paragraphs 1 through 62 as if fully set forth herein.

74.     Between at least 2003 and the present, APL and Maersk individually and collectively agreed amongst themselves to follow consistent billing practices with DoD so as not to draw individual attention to any unlawful practices, and they have maintained consistent practices pursuant to this agreement. The practices APL and Maersk agreed upon are as set forth herein.

75.     Defendants thus knowingly conspired to defraud the United States by getting false claims paid in violation of the False Claims Act. The exact amount of the United States' harm has not yet been determined. The precise amount of damages will be ascertained at trial.

17

WHEREFORE, plaintiffs/relator pray for judgment against defendants as follows:

1. On Count I (Submission of False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages, to be established at trial, that they or their affiliated entities caused, penalties of $11,000 for each false claim, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

2. On Count II (Use of False Statements or Records), an order holding each of the defendants individually and jointly liable for treble the single damages, to be established at trial, that they or their affiliated entities caused, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

3. On Count III (Reverse False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages, to be established at trial, that they or their affiliated entities caused, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

4. On Count IV (Conspiracy to Submit False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages, to be established at trial, that they or their affiliated entities caused, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

5. For the payment of reasonable attorney's fees, costs, and expenses per the False Claims Act.

Dated: September 2, 2005

LAW OFFICES OF PAUL D. SCOTT

BY: _____
PAUL D. SCOTT
Attorney for Relator Brown

18

## JURY DEMAND

Relator Brown hereby demands trial by jury.

19

## PROOF OF SERVICE BY MAIL AND HAND-DELIVERY

I, the undersigned, declare:

I am over the age of 18 and not a party to this cause. I am employed in the City and County of San Francisco. My business address is 201 Filbert Street, Suite 401, San Francisco, California 94133.

On the date set forth below, I caused to be served a copy of the attached **FIRST-AMENDED COMPLAINT AND JURY DEMAND** on the United States, by causing true and correct copies thereof to be sent in envelopes on **September 2, 2005** by mail to:

David T. Cohen
Civil Fraud Section
U.S. Department of Justice
601 D Street, N.W.
Patrick Henry Building
Washington, D.C. 20004

and by hand-delivery to:

Mr. Steven J. Saltiel
Assistant United States Attorney
U.S. Attorney's Office
450 Golden Gate Avenue
San Francisco, California 94102.

I declare under penalty of perjury of the laws of the laws of the United States that the foregoing is true and correct. Executed on **September 2, 2005** at San Francisco, California.

20