1   PAUL D. SCOTT, ESQ.
    California State Bar # 145975
2   LAW OFFICES OF PAUL D. SCOTT
    201 Filbert, Suite 401
3   San Francisco, California 94133
    Tel: (415) 981-1212
4   Fax: (415) 981-1215

5   Attorney for Relator
    [                    ]
6
                    IN THE UNITED STATES DISTRICT COURT
7
                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
8

9   THE UNITED STATES OF AMERICA ex rel. )   NO. C04-4424 MEJ
    [                    ]                )
10                                        )   **SECOND-AMENDED COMPLAINT**
                                          )
11                 Plaintiffs,            )   **DEMAND FOR JURY TRIAL**
                                          )
12          v.                            )
                                          )
    [                    ]                )
13                 Defendants.            )
    _____)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  PAUL D. SCOTT, ESQ.
   California State Bar # 145975
2  LAW OFFICES OF PAUL D. SCOTT
   201 Filbert, Suite 401
3  San Francisco, California 94133
   Tel: (415) 981-1212
4  Fax: (415) 981-1215

5  Attorney for Relator
   Jerry H. Brown II
6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
   THE UNITED STATES OF AMERICA ex rel.  )  NO. C04-4424 MEJ
10 JERRY H. BROWN II.                     )
                                          )
11              Plaintiffs,               )  **SECOND-AMENDED COMPLAINT**
                                          )
12        v.                              )  **DEMAND FOR JURY TRIAL**
                                          )
13 APL LIMITED, NOL GROUP, MAERSK         )  **FILED UNDER SEAL**
   LINE, LIMITED, A.P. MOLLER - MAERSK    )
14 GROUP, and Does 3-50,                  )
                                          )
15                                        )
                Defendants.               )
16                                        )

17

18              JURISDICTION AND VENUE

19      1.      This action is brought under the False Claims Act ("FCA" or "Act"), 31 U.S.C.

20 § 3729 et seq., by plaintiff/relator Jerry H. Brown II ("relator") on behalf of the United States of

21 America, under the qui tam provisions of the Act.
22
       2.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 28 U.S.C.
23
24 § 1345, for the United States is a party to this matter and the causes of action set forth herein are

25 founded upon a law of the United States of America.
26
       3.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732, for
27
28 the defendants conduct business in this District, and a substantial part of the events or omissions

1  giving rise to the claims occurred in this District.

2  PARTIES

3
4      4.   Defendant APL Limited  (aka "American President Lines") (hereinafter "APL") is a

5  corporation with its principal offices in the United States located in Oakland, California.  APL is one

6  of the world's largest container transportation companies.

7      5.   Defendant NOL Group (aka Neptune Orient Lines) (referred to hereinafter as "NOL") is a

8  business organization of unknown type headquartered in Singapore.  At all times relevant referenced

9  herein, defendant APL Limited was a wholly owned subsidiary of NOL, and the two companies have

10  overlapping management.   Relator is informed and believes that at all times relevant herein, NOL

11  dominated, directed and controlled the operations of APL Limited.  Relator is further informed and

12  believes  that NOL authorized and approved the conduct of APL set forth herein.

13

14      6.   Defendant MAERSK LINE, LIMITED ("Maersk Line" or "Maersk") is a corporation

15  with headquarters located in Norfolk, Virginia and operations at locations throughout the United

16  States.  Relator is informed and believes that Maersk Line provides shipping services out of the port

17  in Oakland, California.

18

19      7.   Defendant A.P. MOLLER - MAERSK GROUP ("A.P. Moller - Maersk") is a business

20  organization of unknown type, which has offices throughout the United States, including San

21  Francisco.  Relator is informed and believes that, at all times relevant referenced herein, defendant

22  Maersk Line was a wholly owned subsidiary of A.P. Moller - Maersk, that defendant Maersk Line

23  was dominated and controlled by A.P. Moller - Maersk, and that A.P. Moller - Maersk authorized

24  and approved the conduct by Maersk Line set forth herein

25

26

27

28                                    2

1    8. The true names and capacities of the defendants named above as DOES 3 through 50,

2  inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the

3
   names and capacities of such defendants, together with any additional charging allegations, at such
4
5  time as they are ascertained.

6    9. Plaintiff and relator Jerry H. Brown ("relator") is a Customer Service Representative in

7  Defendant APL's Denver Customer Service Center. He has held this position between March 2006

8  and the present. Between April 1998 and March 2006, relator worked in APL's Denver Customer
9
   Service Center as a Documentation Controller. While employed by defendant APL, relator Brown's
10
11  responsibilities have included documentation and billing for services provided by APL on behalf of

12  the United States Department of Defense ("DoD"), including the items referenced herein. Through

13  his duties as an APL employee, relator had direct access to documents and records supporting the

14
   allegations made in this complaint, and he participated in communications with APL staff and others
15
16  relating to the same.

17    10. This action by relator Brown on behalf of the United States is not based upon a

18  "public disclosure" as defined by 31 U.S.C. § 3730(e)(4)(A). Relator gained direct and independent

19  knowledge of the misconduct alleged herein through his employment at APL and voluntarily

20
   disclosed information regarding that conduct to the United States before filing his complaints
21
22  concerning that conduct. Even if there were a public disclosure in this case, relator would thus

23  qualify as an "original source" as defined by 31 U.S.C. § 3730(e)(4)(A).

24                          CONTRACTUAL BACKGROUND

25    11. Defendants provide shipping services on behalf of DoD. Their services include, inter

26
   alia, the transportation of containers by cargo vessel to and from various ports in countries all around
27

28                                        3

the world and the pickup and transport of such containers to inland locations within those same

countries. Since 2001, the points of destination served by defendants have included, but not been

limited to, Kuwait, Afghanistan and Pakistan. The vast majority of material transported by

defendants for DoD has been transported in containers.

USC-03

12.     In or around February 2, 2001, the Department of Defense issued Solicitation No.

DAMT01-00-R-0056. APL responded to the solicitation and, on or about September 1, 2001,

entered into Contract No. DAMT01-01-D-0165 (hereinafter Contract No. 0165) with the Military

Traffic Management Command ("MTMC"). (On January 1, 2004, MTMC changed its name to the

Surface Deployment and Distribution Command ("SDDC"). The current acronym "SDDC" is used

herein to refer to both MTMC and SDDC).

13.     APL's Contract 0165 covered September 1, 2001 through August 31, 2002 and was later

extended to February 28, 2003. The contract provided for the transportation of goods by APL on

behalf of DoD to various locations around the world. Contract 0165 incorporated the terms of

Universal Services Contract 03 ("USC-03"). USC-03 set forth, inter alia, the destinations to be

served, the various services to be provided, and the rates applicable for certain services, including

local transportation of containers.

14.     On or about the same date that APL entered into Contract 0165, Maersk entered into the

same basic contract with DoD, which also incorporated the terms of USC-03 and covered the same

period of time, just under a different contract number.

15.     Per the terms of USC-03, and modifications thereto, APL and Maersk agreed to deliver

containers from various ports in the Middle East, Pakistan, and Afghanistan to inland locations at

4

1 specified linehaul/drayage rates. These rates were designed to cover costs associated with the

2 delivery of containers from ports of discharge to inland locations, with the possible exception of

3
4 costs associated with port handling, port storage and trailer detention charges, to the extent such

5 charges were caused by U.S. government delay.

6 16. The linehaul/drayage rates for deliveries from ports in Kuwait to destinations inside

7 Kuwait were set forth in Table 3E to USC-03 and initially ranged from $115 to $315.

8 17. Between approximately September 1, 2001 and February 28, 2003, APL and Maersk
9
10 submitted or caused to be submitted invoices to SDDC for payment by the United States at the

11 foregoing rates associated with their deliveries of cargo pursuant to USC-03. Included with the

12 invoices submitted to the United States were bills of lading that generally identified the cargo

13 transportation services provided and the rates charged for such services. APL's invoices were paid

14 by the United States. Relator is informed and believes that Maersk's invoices were also paid by the
15
16 United States.

17 USC-04

18 18. In or around March 1, 2003, APL entered into Contract No. DAMT01-03-0129

19 (hereinafter Contract 0129) with SDDC, pursuant to Solicitation Number DAMT01-02-R-0066. The

20
21 contract, which incorporated the terms of Universal Services Contract 04, provided for "[o]cean and

22 intermodal transportation services for all DoD shippers worldwide (container/breakbulk) for one year

23 base period of performance 01 Mar03 thru 29Feb 04" and contained an option for "01Mar04 thru

24 28Feb05." The contract set forth, inter alia, the destinations to be served, the various services to be

25 provided, and the rate rules applicable for different services. The contract was extended pursuant to
26
27 the option in the contract, then later extended multiple times, ultimately to March 2006.

28 5

19.     On or about the same date that APL entered into Contract 0129, Maersk entered into the same basic contract with DoD, which also incorporated the terms of USC-04 and covered the same period of time, just under a different contract number.

20.     Per the terms of USC-04, and modifications thereto, APL and Maersk agreed to deliver containers from various ports in the Middle East, Pakistan, and Afghanistan to inland locations at specified linehaul/drayage rates.  These rates were intended to cover all costs associated with the deliveries, with the possible exception of port handling, port storage and trailer detention charges, to the extent such charges were caused by U.S. government delay.

21.     The linehaul rates for deliveries from ports in Kuwait to destinations inside Kuwait were set forth in Table 3E to USC-04 and initially ranged from $115 to $315, depending on the company, the size and type of container, and the destination within Kuwait.   Between approximately March 1, 2003 and the present, APL and Maersk have billed DoD at the rates associated with their deliveries of cargo pursuant to USC-04 and any modifications thereto.  Included with the invoices submitted to the United States were bills of lading that generally identified the cargo transportation services provided and the rates charged for such services.   APL's invoices were paid by the United States. Relator is informed and believes that Maersk's invoices were also paid by the United States.

22.     In or around March 16, 2003, APL's Contract 0129 was modified pursuant to its Changes Clause and Modification No. P00004 to incorporate certain "ongoing rates" into the contract.  The effect of the modification was to increase the linehaul/drayage rates for certain point to port deliveries within Kuwait and also to increase the mileage rates for deliveries to destinations in Kuwait not otherwise specifically covered by the modification.   The new rates under the modification ranged from $1,030 to $1,205, depending on the size of container and destination.  For

6

1 deliveries 0-50 miles to other locations, the mileage rates were set at $1,115 for containers under 40

2 feet and at $1,205 for containers 40 feet and over. Additional amounts were to be paid for longer

3 deliveries.
4

5 23. Between approximately March 2003 and January 2004, APL submitted or caused to be

6 submitted invoices to SDDC for payment by DoD at the modified rates for deliveries of containers

7 within Kuwait Included with the invoices submitted to the United States were bills of lading that

8 generally identified the transportation services provided and the rates charged for such services.
9
10 These invoices were paid by the United States.

11 24. Invoices associated with the false claims described in this complaint were originally

12 prepared by APL's office in Denver, Colorado and submitted to SDDC in Ft. Eustis, Virginia and/or

13 Alexandria, Virginia. In or around November 2003, claims for payment were prepared by APL's

14 office in Denver, Colorado and submitted to the contracting officer for SDDC in Arlington ,Virginia,
15
16 pursuant to a Memorandum of Agreement entered into by SDDC with APL, Maersk, and other

17 carriers in November 2003 ("Memorandum of Agreement"). Additional invoices and claims were

18 submitted through both mechanisms thereafter.

19 COORDINATION AMONG CARRIERS
20
21 25. Since at least October 2003 and possibly earlier, APL and Maersk have engaged in a

22 knowing and intentional practice of coordinating their billing practices with and amongst each other,

23 with the manifest intention of not raising questions by DoD about such practices, including those

24 described herein.

25 26. Eileen Murphy, relator's immediate superior at APL, and others in APL's management
26
27 have made repeated comments to Mr. Brown about the need to coordinate various specific charging

28 7

1  practices with Maersk.  Similar comments have been made to Mr. Brown by his superiors that

2  indicate coordination of billing practices has routinely taken place amongst APL and Maersk.

3
### DOUBLE-BILLING OF KTS CHARGES

4

5  27.  Beginning in November 2003 and continuing to at least January 2004, APL

6  systematically billed SDDC directly for transportation-related charges that should already have been

7  covered by the rates being paid to APL under Contracts 0165 and 0129.  These double-billed charges

8  covered the period of approximately August 2002 through December 2003 and were ultimately paid

9  by DoD.

10

11  28.  The charges doubled-billed by APL were initially billed to APL by Kuwait

12  Transcontinental Shipping ("KTS").  During all relevant periods referenced herein, KTS provided

13  local ground transportation (linehaul/drayage) services on behalf of APL for containers delivered to

14  Kuwait.  The following items were included in KTS's charges to APL for its services:  1) Custom's

15  Clearance, 2) Transport Charges, 3) Delivery Order Charge, 4) Port Gate Pass Charge, 5) Port

16  Landing Charges, 6) Port Handling Charges, 7) Port Storage Charges, and 8) Trailer Detention

17  

18  Charges.

19  29.  Most, if not all, of the foregoing costs, however, were associated with the transportation

20  of the cargo and thus were covered under the linehaul/drayage rates paid to APL under Contracts

21

22  0165 and 0129 (or modifications thereto) and thus should not have been separately billed to DoD.

23  30.  In a May 18, 2003 e-mail regarding the KTS charges, APL Senior Finance Analyst Vivek

24  Sathe stated "[a]ctually out of the above we should be reimbursed only towards" port handling, port

25  storage, and trailer detention charges.  In a June 17, 2003 e-mail on the same subject, Eric Mensing,

26  APL's Vice President of Government Markets, indicated his general agreement with Mr. Sathe's

27

28  8

1  conclusion, saying "[a]s discussed, many of these cannot be billed." APL personnel thus internally

2  admitted that most of the costs were not separately reimbursable.

3
4  31.  Despite the foregoing knowledge, APL falsely billed DoD at least approximately $2.2

5  million for KTS charges for the period November 2003 through January 2004.

6  32.  The false claims referenced above were generally submitted in the form of spreadsheets.

7  A first claim was submitted on or about November 3, 2003, and additional claims were submitted

8  pursuant to the Memorandum of Agreement, including, but not limited to, a supplemental claim

9
10  dated November 21, 2003 and a second supplemental claim dated December 30, 2003. These claims

11  pertained to events up to and including December 2003. Additional claims were submitted in the

12  form of detention accruals for January 2004. Containers impacted by the foregoing KTS double-

13  billing scheme were generally listed in bills of lading submitted to SDDC by APL. Attached as

14  Exhibit H is a spreadsheet titled "APL BL Numbers for KTS Invoices," which references such bills

15
16  of lading. The bills of lading referenced in Exhibit H list certain of the containers for which

17  duplicate KTS charge were submitted to the Government by APL.

18  33.  The foregoing false claims were made with the knowledge and consent of numerous

19  personnel at APL, including, but not limited to, Eileen Murphy, Eric Mensing, Lars Magnuson, and

20  Vivek Sathe, and Akshay Arora.

21
22  34.  Relator is informed and believes that APL created a reserve line in its books to

23  account for the possibility that some or all of the foregoing double-billed amount would have to be

24  repaid. Relator is informed and believes that APL also has other items on its reserve schedule that

25  reflect additional improper charges to DoD.

26
27  35.  In or around February 2007, approximately one year after APL had learned of the

28  9

1  Government's investigation in this matter, APL reimbursed the Department of Defense for certain

2  KTS charges improperly charged to the United States.

3
4          36.     Like APL, Maersk has billed SDDC for the same types of charges referred to above,

5  which should properly have been covered by the linehaul/drayage rates already being paid to Maersk

6  under the terms of USC-03 and USC-04. Relator is informed and believes that Maersk has followed

7  this practice since at least August 2002 through at least August 2005. Relator is further informed

8  and believes that Maersk was aware that it was already being reimbursed for the subject charges

9
10 under the linehaul drayage rates but continued to bill the government notwithstanding that

11 knowledge. Relator is informed and believes that Tony Nowotarski and Rhonda Clark were amongst

12 the employees at Maersk responsible for the submission of the improper charges to SDDC during the

13 period mentioned. Relator is informed and believes that Maersk followed the same basic invoicing

14 procedure as APL prior to November 2003. From November 2003 onward, Maersk also submitted

15
16 its claims for payment pursuant to the Memorandum of Agreement in the same manner as APL.

17 Relator is further informed and believes that the charges have been paid by SDDC.

18                          REEFER MAINTENANCE AND PLUG-IN CHARGES

19         37.     Both USC-03 and USC-04 permitted APL and Maersk, under specified

20 circumstances, to charge SDDC a "reefer maintenance" charge to compensate them for expenses

21
22 associated with operating (i.e., powering) refrigerated containers. This charge was permitted after

23 seven days of "free time" that is supposed to commence when containers are available for delivery

24 and/or unstuffing.

25         38.     Section 4.3.1.3.1 of both USC-03 and USC-04 states as follows: "When the return of

26
27 refrigerated containers to the Carrier is delayed by the Government beyond the allowable free time,

28                                             10

1  the carrier may assess a reefer maintenance charge in addition to those charges for container

2  detention.   The reefer maintenance charge shall be added to the per diem detention charge when, due

3
4  to Government delay, the carrier incurs additional expenses in maintaining operation of those

5  refrigerated containers so delayed.  The Carrier will certify such charges to the Contracting Officer."

6          39.     The contracts then identify two categories of rates - Column A and Column B rates.

7  The Column A rate for containers "20 feet and over" is $7.76 per 24 hour period or part thereof, the

8  Column A rate for containers "40 feet and over" is $11.21.  The Column B rate for containers "20

9
10  feet and over" is $29.90 per 24 hour period or part thereof, and the Column B rate for containers "40

11  feet and over" is $43.70.  Column A rates are appropriate "when refrigerated containers are delayed

12  at those facilities where electrical power is available for direct connection to the Carrier's container."

13  Column B rates are appropriate only "when refrigerated containers are delayed at those facilities

14  where the Carrier is required to maintain operation of refrigerated containers without the use of

15
16  electrical power."  See Section 4.3.1..3.1.  "When a Carrier bills in accordance with Column B

17  above, it must certify that electrical power was unavailable at that facility."  Id.

18          40.     APL has charged reefer maintenance fees to SDDC at either Column A or B rates

19  (after the expiration of "free time" as calculated by APL) for all containers delivered to the Middle

20  East and Pakistan/Afghanistan between at least January 2003 and March 2006.  The false claims

21
22  referenced above were generally submitted in the form of spreadsheets.  A first claim was submitted

23  on or about November 3, 2003, and additional claims were submitted pursuant to the Memorandum

24  of Agreement, including, but not limited to, a supplemental claim dated November 21, 2003, a

25  second supplemental claim dated December 30, 2003, and a third supplemental claim dated January

26
27  26, 2004.  These claims pertained to events up to and including December 2003.  Additional claims

28                                         11

1   were submitted in the form of detention accruals for January 2004 through August 2005.   The

2   claims submitted by APL for these costs have been paid by SDDC through at least December 2004.

3
4       41.       Maersk has similarly charged reefer maintenance charges to SDDC (after the

5   expiration of "free time" as calculated by Maersk) for all containers delivered to the Middle East and

6   Pakistan/Afghanistan between at least January 2003 and the present.  Maersk submitted claims for

7   payment for the reefer maintenance charges pursuant to the Memorandum of Agreement on a regular

8   basis after November 14, 2003, including, but not limited to, in claims submitted on January 6, 2005,
9
10  February 2, 2005, March 16, 2005, March 24, 2005, and May 27, 2005 for detention related charges,

11  and in monthly detention accruals thereafter.   Relator is informed and believes that these invoices

12  have been paid by SDDC.

13                  Unsubstantiated Reefer Maintenance Charges

14      42.       APL has assessed the foregoing reefer maintenance charges, despite lacking evidence,
15
16  as required by the terms of USC-03 and USC-04, of having incurred actual operating expenses for

17  most of the relevant containers for the periods charged.  APL lacks such evidence, because the

18  containers have either not been operated at APL's expense for the entire period billed or simply not

19  been operated at all, while the containers were in the government's possession.

20
21      43.       Between at least January 2003 and August 2005, APL routinely and systematically

22  charged reefer maintenance fees for all containers held by DoD, despite the fact that DoD was paying

23  for the power or fuel used to operate the refrigerated containers.  Similarly, during the same period,

24  APL systematically charged reefer maintenance fees to SDDC for all containers in DoD's

25  possession, without even verifying that the refrigeration equipment on the containers was being
26
27  operated at all, through at least August 2005.

28                                          12

44.     Relator is informed and believes that APL knowingly billed SDDC in excess of $6 million in false claims pursuant to the foregoing scheme, and SDDC has paid the claims. The false claims referenced above were generally submitted in the form of spreadsheets. A first claim was submitted on or about November 3, 2003, and additional claims were submitted pursuant to the Memorandum of Agreement, including, but not limited to, a supplemental claim dated November 21, 2003, a second supplemental claim dated December 30, 2003, and a third supplemental claim dated January 26, 2004. These claims pertained to events prior to and including December 2003. Additional claims were submitted in the form of Detention Accruals for January 2004 through August 2005. The claims submitted by APL for these costs have been paid by SDDC through at least December 2004.

45.     Between at least June 2002 and the present, Maersk has also billed reefer maintenance to SDDC for containers held by DoD, despite the fact that DoD was paying for the power or fuel used to operate the refrigerated containers. Relator is informed and believes that, during the same period, Maersk routinely charged reefer maintenance fees to SDDC for containers in DoD's possession, without even verifying that the refrigeration equipment on the containers was being operated at all. Maersk submitted claims for payment for the reefer maintenance charges pursuant to the Memorandum of Agreement on a regular basis after November 14 ,2003, including, but not limited to, in claims submitted on January 6, 2005, February 2, 2005, March 16, 2005, March 24, 2005, and May 27, 2005 for detention related charges, and in monthly detention accruals thereafter. The total amount of paid claims is unknown to relator but is estimated at more than $10 million.

Billing Incorrect Rate for Reefer Maintenance Charges in Pakistan/Afghanistan

46.     As noted above, APL and Maersk lacked justification in many instances for the

13

1  assessment of any reefer maintenance charges for containers delivered to the Middle East and

2  Pakistan/Afghanistan between approximately January 2003 through the present. With respect to

3
4  Pakistan and Afghanistan in particular, even in those cases where some charge was justified, the rate

5  charged by APL and Maersk has also been falsely inflated.

6      47.     In Pakistan/Afghanistan, from at least October 20, 2002 through December 26, 2003,

7  APL charged Column B rates to SDDC for all containers in Karachi, Pakistan (after the expiration of

8  "free time" as calculated by APL), even if the containers were still at the Port and power was
9
10 available to operate the refrigeration units on the containers. Attached as Exhibit I is a spreadsheet

11 titled "Afghan Reefer Maintenance," which lists certain of the containers impacted by the foregoing

12 APL scheme to charge Column B rates for containers in port. A first claim was submitted on or

13 about November 3, 2003, and additional claims were submitted pursuant to the Memorandum of

14 Agreement, including, but not limited to, a supplemental claim dated November 21, 2003, a second
15
16 supplemental claim dated December 30, 2003, and a third supplemental claim dated January 26,

17 2004. These claims pertained to events occurring prior to and including December 2003.

18      48.     Between approximately January 2004 through at least August 2005, APL's practice

19 changed, and it generally charged SDDC at Column A rates (after "free time") for containers at the

20 Port in Karachi, Pakistan, and it charged Column B rates for containers once they left the Port for
21
22 delivery to Afghanistan or elsewhere. Relator is informed and believes that APL maintained this

23 same practice after August 2005 through at least March 2006.

24      49.     The Column B rates charged by APL to SDDC for containers held at the Port in

25 Karachi were excessive and false, for power was available to APL in Karachi to operate the
26
27 refrigerated containers. The amount of these overcharges was calculated and acknowledged

28                                      14

1   internally at APL in approximately early 2004, but they were not refunded to the Government at that

2   time.  After APL learned of the United States' investigation in February 2006, APL reimbursed the

3
4   Government for at least certain of the amounts overcharged for Column B rates in approximately

5   February 2007.

6        50.      The Column B rates charged by APL to SDDC for containers after they left the Port

7   in Karachi were also generally false, for the vast majority of refrigerated containers associated with

8   the charges did not have generators (aka "Gensets") on them which could potentially justify the
9
    assessment of Column B rates for the operation of the containers.   As just one example, in
10
11  September 2003, DoD was in possession of 77 of APL's  refrigerated containers in Khandahar,

12  Afghanistan, but only ten of the containers had Gensets.  Nonetheless, APL charged Column B reefer

13  maintenance rates for all 77 containers for the entire period they were held by DoD.

14
         51.      Relator is informed and believes that the vast majority of refrigerated containers
15
16  delivered to Pakistan/Afghanistan by APL from January 2003 through the present did not have

17  Gensets, yet they were billed to SDDC by APL at the rate for containers with such equipment, and

18  SDDC paid the claims.   The amount overcharged pursuant to this scheme will be established at trial.

19       52.      Relator is informed and believes that APL created a reserve on its books to account
20
    for the possibility that APL would be required to return funds to DoD as a result of APL charging
21
22  excessive rates for reefer maintenance.

23       53.      Like APL, Maersk charged DoD at Column B rates for all of the refrigerated

24  containers delivered to Pakistan/Afghanistan by Maersk.  Relator is informed and believes that this

25  practice began in approximately June 2002 (and perhaps earlier) and has continued through at least
26
    March 2006.  Maersk has charged Column B rates from at least the expiration of the freetime period
27

28                                                  15

1 up through the date that the containers have been returned to Maersk. These rates have been

2 charged even when containers have been in the Government's possession, and the Government has

3
4 been paying to power the containers at its own facility. Relator is informed and believes that

5 Maersk has also, at times, charged Column B rates, after the expiration of freetime, even when

6 containers were at port and power was available to plug-in the containers. As an example of the

7 foregoing misconduct, in Maersk's May 27, 2005 claim, Maersk charged Column B rates for all of

8 the containers in the invoice both for the time that the containers were at port after the expiration of

9
10 free-time (as calculated by Maersk) and for the time that containers were in the Government's

11 possession. Attached as Exhibit E hereto is a spreadsheet titled "Final March Detention," which

12 includes a sample of the foregoing reefer maintenance charges by Maersk in a May 27, 2005 invoice.

13 Relator is informed and believes that all of the foregoing charges have been paid by the United

14 States.

15

16 Double-Billing Plug-In Charges

17 54. In those cases where APL has actually incurred a "plug-in" charge for the operation of

18 a container, it has double-billed that amount to DoD.

19 55. For example, when APL incurred a "plug-in charge" in connection with containers

20
21 discharged at the port in Karachi, Pakistan between January 2003 and the present, it subsequently

22 billed DoD directly for the cost of that expense. But, under the terms of Contracts 0129 and 0165,

23 any such charges should already have been covered by the reefer maintenance rates also being billed

24 by APL, for those rates were explicitly intended to compensate APL for the costs (such as plug-in

25 charges) of operating the containers.

26
27 56. The total amount double-billed by APL for plug-in charges at the Karachi Port for the

28 16

1   period January 1, 2003 through December 31, 2004 is approximately $6.15 million. A first claim

2   was submitted on or about November 3, 2003, and additional claims were submitted pursuant to the

3
4   Memorandum of Agreement, including, but not limited to, a supplemental claim dated November 21,

5   2003, a second supplemental claim dated December 30, 2003, and a third supplemental claim dated

6   January 26, 2004. These claims pertained to events prior to and including December 2003.

7   Additional claims were submitted in the form of Detention Accruals for January 2004 through

8   August 2005. The claims submitted by APL for these costs have been paid by SDDC through at

9   least December 2004.

10

11          Excessive Plug-In Charges

12          57.     In addition to double-billing for plug-in charges as described above, APL has also

13   charged SDDC a higher amount for the plug-in charges in Karachi, Pakistan than the charges it was

14   actually assessed by the port.

15

16          58.     For the period of approximately January 1, 2003 through at least August 31, 2005,

17   APL has charged SDDC $60 per day for plug-in charges associated with the containers in Karachi,

18   but that is not the rate that APL has paid. APL has negotiated a discount with the Port that allows it

19   to pay a reduced rate (which may be as low as zero) based on the total number of containers (both

20   military and commercial) on a particular vessel. The actual rate was $41 per day up through

21
22   approximately June 2003 and became $25 per day in July 2003 through August 2005. The foregoing

23   discounts were not passed on to SDDC by APL. After learning of the government's investigation in

24   approximately February 2006, however, APL reimbursed the government for certain of the excess

25   plug-in charges in or around February 2007. Attached as Exhibit J hereto is a spreadsheet titled

26
27   Pakistan Reefer Port Plug-In Charges Through June 2003, which includes certain of the containers

28                                                  17

1  for which APL charged $60 per day for plug-in charges when its own cost was $41 per day.

2  Attached as Exhibit K hereto is a spreadsheet titled Pakistan Reefer Port Plug-In Charges After June

3
4  2003, which includes a sample of containers for which APL charged $60 per day when its own cost

5  was $25 per day.

6     59.     A first claim was submitted on or about November 3, 2003, and additional claims

7  were submitted pursuant to the Memorandum of Agreement, including, but not limited to, a

8  supplemental claim dated November 21, 2003, a second supplemental claim dated December 30,

9
10 2003, and a third supplemental claim dated January 26, 2004.  These claims pertained to events prior

11 to and including December 2003.  Additional claims were submitted in the form of Detention

12 Accruals for January 2004 through at least August 2005.  The claims submitted by APL for these

13 costs have been paid by SDDC through at least December 2004.  The amount overcharged pursuant

14 to this scheme will be established at trial.

15
16                                     FREE TIME

17    60.     APL and Maersk were entitled under USC-03 and USC-04 to charge detention and

18 reefer maintenance under specified circumstances in connection with particular containers only after

19 a period of "freetime" associated with each particular container had ended.

20    61.     Both USC-03 and USC-04 contain specific provisions that define the concept of

21
22 "Freetime."

23    62.     Section 4.3.1.3.1 states as follows in both USC-03 and USC-04: "Performance

24 Objective No. 35 – The contractor must provide 7 days freetime, excluding Saturdays/Sundays and

25 holidays form containers/chassis except as indicated below.  Freetime will run for any delays caused

26
27 by the Government.  Freetime will commence at 0001 hours on the first working day the container is

28                                        18

1 available for delivery and/or unstuffing. When freetime is exceeded, contractors will be paid at

2 detention rates and for reefer maintenance as stated below."

3
4      63.     The detention rates set forth in Section 4.3.1.3.1 for non-refrigerated (a/k/a "dry")

5 containers are as follows in both contracts:

|                   | First Three Days | Thereafter |
|-------------------|------------------|------------|
| 20 feet and Over  | $15              | $22        |
| 40 feet and Over  | $21              | $35        |

9
10      64.     The detention rates set forth in Section 4.3.1.3.1 for refrigerated containers are as

11 follows in both contracts:

|                   | First Three Days | Thereafter |
|-------------------|------------------|------------|
| 20 feet and Over  | $46              | $63        |
| 40 feet and Over  | $63              | $85        |

15
16      65.     Containers are not "available for delivery and/or unstuffing" until at least after they

17 have been customs cleared or later (e.g., when APL was able to deliver the containers).

18 Nonetheless, despite the foregoing clear contract language, during the time-frame covered by USC-

19 03 and USC-04 (i.e., approximately September 2001 through March 2006), APL has not commenced

20 its calculation of freetime at the point when containers have cleared customs or later. APL has

21
22 commenced its calculation of "freetime" (i.e., it has started the detention/freetime clock) upon the

23 date that containers have been discharged from arriving vessels, regardless of whether the

24 Government caused the delay.   This practice is inconsistent with how APL has calculated freetime

25 for deliveries on behalf of DoD to the United States.  In this, and other contexts, APL has

26 demonstrated a knowledge of how to calculate freetime correctly but has simply not done so in

27

28                                                19

1   connection with deliveries to the Middle East, Afghanistan, Pakistan, and possibly elsewhere.

2       66.     The foregoing practices of APL have led to overcharges to the United States by APL

3
    during all phases between the discharge of containers from vessels and their return to port.
4

5   Time at Port

6   67.     Between at the latest January 2003 and continuing through at least August 2005, in Kuwait

7   and Afghanistan, after containers were first discharged from ships, they had to be picked up by

8   properly equipped trucks before they could leave the port.  In the vast majority of cases, however, in
9
    both Kuwait and Pakistan, containers were delayed for extended periods of time at port, due to a
10

11  shortage of equipment and/or personnel to transport the containers on behalf of APL or its agents.

12      68.     In 2003, non-refrigerated containers sat at the port in Karachi over 16 days on average

13  before being transported by APL, and refrigerated containers sat at the port in Karachi over 26 days

14  before being transported.

15
        69.     In 2004,  non-refrigerated containers sat at the port in Karachi over 21 days on
16
17  average before being transported by APL, and refrigerated containers sat at the port in Karachi over

18  70 days before being transported.

19      70.     Between January and July 2005, non-refrigerated containers sat at the port in Karachi

20  over 7 days on average before being transported by APL, and refrigerated containers sat at the port in
21
22  Karachi over 13 days before being transported.

23      71.     APL charged the United States at the rates specified above for detention and reefer

24  maintenance while containers sat at the port in Karachi, Pakistan.

25      72.     Between January 2003 and mid 2005, APL charged in excess of $14 million in
26
    detention and reefer maintenance charges for containers that sat at the port in Karachi before they
27

28                                                  20

1  were delivered to the Government. Between mid 2003 and mid 2005, APL charged in excess of $5

2  million for detention and reefer maintenance charges for containers that sat at the port in Kuwait

3
4  before they were delivered to the Government. Neither of these estimates are adjusted downward for

5  freetime credits given by APL, as such credits could have been used by the United States when it

6  held containers at bases and thus was responsible for delays.

7      73.    Notwithstanding the foregoing facts, and APL's knowledge that the United States was

8  not responsible for the vast majority of delays at port in Kuwait and Karachi, APL knowingly

9
10  requested and was paid detention based on the provisions above, which specifically indicated that

11  APL's entitlement to payment was conditioned on the United States being responsible for the delay

12  underlying the charge.

13      74.    As just one discrete example, attached as Exhibit A is a spreadsheet titled "Karachi

14  Customs Processing Times," which lists specific containers that were delayed at port in Karachi,

15
16  after customs clearance, during just four months of 2005, for reasons that were not caused by the

17  United States.

18      75.    APL wrongfully charged the United States detention and related charges for the

19  foregoing containers, knowing that it had no legitimate basis to believe that the United States had

20  caused the foregoing containers to be delayed at the port.

21

22      76.    Detention and related charges were similarly charged to the United States by APL for

23  thousands of additional containers delayed in port in Karachi or in Kuwait for reasons other than

24  U.S. Government caused delay, between at least January 2003 through March 2006.

25  Delays in Transit of Containers from Port to Point of Destination

26
27      77.    Once containers were picked up by trucks at port, the containers had to be transported

28                                          21

1  from that port to the point of destination.

2      78.    The time taken to transport a container from the port to its point of destination (a/k/a/

3  "transit time") is not subject to any detention charges, unless there is some "delay caused by the

4

5  Government" in transit.  Nevertheless, APL charged the U.S. detention for all days spent in transit

6  by all containers traveling from Karachi to destinations in Afghanistan between approximately

7  January 2005 and August 2005.  Detention was charged on the containers by APL despite the fact

8  that it lacked any legitimate basis to believe that the United States was causing delays to justify the

9

10  charges.  Relator identified this problem for his supervisor Eileen Murphy in September 2005 but the

11  problem was not corrected as of his removal from his position by APL in March 2006.  The invoices

12  which include the false transit time charges for over 4,000 containers transported in this period

13  include, but are not limited to, the APL Detention Accruals for January 2005 through August 2005.

14  The claims submitted by APL for these costs have been paid by SDDC.

15

16      79.    Between no later than the beginning of 2003 and the present, APL has experienced

17  numerous and repeated delays in transporting containers from the port in Karachi to points of

18  destination in Afghanistan.  Deliveries have been delayed by work stoppages, delays at the

19  Pakistan/Afghan border, inclement weather, impassable roads, etc.  These delays have contributed to

20  the shortage of available equipment for APL to transport containers, as delays in trucks returning to

21

22  the port have translated to increased delays in containers leaving the port, yet APL has still charged

23  the United States detention and reefer maintenance for containers so delayed during the above

24  period.

25      80.    Between January 2005 and August 2005, when APL was charging for transit time,

26  more than 350 containers spent in excess of 10 days in transit, and more than 100 containers spent in

27

28                                              22

1 excess of 40 days in transit. One notable example of delay during the January through August 2005

2 period was a three-week strike at the Pakistan/Afghan border in July 2005. The strike caused

3
4 substantial delays in the transport of containers from Pakistan into Afghanistan between at least July

5 7 through July 19, 2005, and APL charged the United States detention for the delays, despite the fact

6 that the strike was not a "delay caused by the [United States] Government." The false claims

7 associated with these containers were included in APL's detention accruals for January 2005 through

8 August 2005. Attached as Exhibit B is a spreadsheet titled "Border Strike," which identifies a
9
10 sample of containers where transit time was billed to the United States, despite the fact that the delay

11 in transit was due to a strike by non-government personnel.

12      81.      Relator is informed and believes that other delays occurred in 2005 and in prior years

13 as well, yet APL treated the delays as something other than transit time, which resulted in yet

14 additional false charges to the United States.
15
16 Delays in Return of Containers from Point of Destination to Port

17      82.      Section 4.3.1.3.5 of USC-03 and USC-04 states that "[t]he Contractor must remove

18 empty containers within three (3) working days after receiving notice from the Government that the

19 container is available." Section 4.3.1.3.1 further states, in a section addressing deliveries, that

20 [detention] time "must end when the contractor is notified that the container is released."
21
22      83.      Once containers were delivered to bases in Afghanistan or Kuwait, they would

23 frequently be kept at DoD military bases for extended periods of time by the Government, and APL

24 would charge detention during such periods. APL did not, however, only charge detention for those

25 periods that the United States caused containers to be delayed at military bases.
26
27      84.      Throughout the period covered by USC03 and USC04, APL knowingly charged

28                                                    23

1  detention for time spent by numerous containers at U.S. military bases or other facilities when empty

2  containers were ready to be picked up and the United States was not causing any delay in the

3  containers being returned to the port.

4

5  85.     When containers were empty and ready to be picked up in Kuwait and Afghanistan,

6  the United States and/or its agents would notify APL that the containers were ready to be picked up.

7  For example, beginning no later than September 2005, notification was given to APL by the United

8  States or its agents through the Container Management Support Tool (a/k/a "CMST") computer

9

10  system when containers were empty. In many instances, however, APL did not immediately retrieve

11  empty containers upon notice being provided by the United States that the containers were available

12  to be picked up.

13  86.     Between September 21, 2005 and December 31, 2006, more than 4,500 containers

14  were retrieved at bases in Afghanistan at least 1 day or more after notice was given to APL that the

15

16  containers were empty and available for pick-up.

17  87.     Attached as Exhibit C is a spreadsheet titled CMST Return Data - Afghanistan that

18  reflects data from September 2005 through December 2006 concerning containers retrieved at

19  locations in Afghanistan after notice was given to APL that they were empty and available to be

20  removed. As indicated by the spreadsheet, in at least 1,500 instances, containers were picked up

21

22  more than 10 days after notice was given.  One example from Exhibit C shows that on June 14,

23  2005, the United States notified APL via CMST that more than 37 containers were available for pick

24  up at Bagram Air Force Base (ATUH), but it took until September 21, 2005 for APL to pick up 8 of

25  the containers (99 days) and until September 22, 2005 for APL to pick up the remaining 29

26

27  containers (100 days).  Similarly, on February 2, 2006, the United States notified APL via CMST

28                                          24

1  that more than 10 containers were available for pick up at Kandahar Air Force Base (ELYV) in

2  Afghanistan, but nine of the containers were not picked up until March 30, 2006 (56 days), and one

3
4  of the containers was only picked up a day earlier on March 29, 2006 (55 days). As a last example,

5  on December 13, 2005, the United State's agent at Haliburton notified APL via CMST that more

6  than 31 containers were available for pick up at Bagram Air Force Base (CPUH) in Afghanistan, but

7  APL did not pick up the containers until January 17, 2006 (35 days).

8      88.     APL charged the United States detention for all of the days containers sat at bases in

9
10  Afghanistan after notice was given that they were empty, despite having knowledge that the delays in

11  the return of the containers during such periods were not "caused by the [United States]

12  Government." False claims associated with these containers were included in APL's claims under

13  the Memorandum of Agreement and in APL's detention accruals for January 2005 through

14  December 2006.

15      89.     Attached as Exhibit D is a spreadsheet titled CMST Return Data - Kuwait that reflects

16

17  data from May 1, 2005 through October 31, 2006 concerning containers retrieved at locations in

18  Kuwait after notice was given to APL that they were empty and available to be removed. As

19  indicated by the spreadsheet, in at least 1,300 instances, containers were picked up more than 10 days

20
21  after notice was given. As one example, between August 15, 2006 and August 22, 2006, the United

22  States notified APL that 32 empty containers were available for pick up at Arifjan Air Force Base in

23  Kuwait (A43Y), but the containers were not picked up until November 4 and November 5, 2006 (74-

24  82 days). Similarly, on June 4, 2005, the United States notified APL that two containers were

25  available for pick up at AAFES PWC Distribution Center Mina Abdulla (QHNA), but the containers

26
27  were not picked up until July 19, 2005 (45 days). As a last example, on June 21, 2005, the United

28                                         25

1  States notified APL via CMST that 22 empty containers were available for pick-up at Shuwaykh

2  (PN1), but the containers were not picked up until July 2, 2005 (11 days).

3
4        90.    APL charged the United States detention for all of the days containers sat at bases in

5  Kuwait after notice was given that they were empty, despite having knowledge that the delays in the

6  return of the containers during such periods were not "caused by the [United States] Government."

7  Holidays

8        91.    Pursuant to Section 4.3.1.3.1 of contracts USC-03 and USC-04, "The contractor must

9
10  provide 7 days freetime, excluding Saturdays/Sundays and holidays . . . " before charging detention.

11  When charging detention, APL generally gave credit for the 7 days of freetime plus Saturdays and

12  Sundays, but APL systematically failed to give credit for either local or U.S. holidays.

13        92.    Prior to and including February 2004, consistent with Section 4.3.1.3.1, APL gave

14  credit to the United States for U.S. holidays when calculating freetime for purposes of charging

15
16  detention and reefer maintenance in Pakistan, Kuwait, Bahrain, Djibouti, Iraq and UAE.

17        93.    During the same period, contrary to the terms of Section 4.31.3.1, APL did not give

18  credit to the United States for local holidays when calculating freetime for purposes of charging

19  detention and reefer maintenance on containers in Pakistan, Kuwait, Bahrain, Djibouti, Iraq and

20  UAE.

21
22        94.    On February 4, 2004, Pam Broglio at SDDC advised APL personnel in an email that

23  local holidays should not be counted as part of freetime (i.e., that APL must effectively give an extra

24  day of freetime for local holidays). Notwithstanding this instruction, APL failed to give credit for

25  local holidays thereafter, which resulted in increased detention and reefer maintenance charges on

26  containers in the referenced countries.

27

28                                                26

95.     Moreover, contrary to the requirements of Section 4.3.1.3.1., between at least March 2004 and August 2005, APL failed to give the United States credit for either U.S. or local holidays, even when those holidays fell within the free-time period that APL started after the date of container discharge. APL thus charged excessive amounts for detention and reefer maintenance to the United States on containers for holidays where no such charges should have applied.

96.     In August 2005, the process changed to a format by which SDDC advised APL of what it estimated as the amount owing for detention. Once this new system was introduced, SDDC specifically asked for and received credit from APL for U.S. federal holidays in the detention calculation. APL did not give credit, however, for the U.S. federal holidays that occurred between March 2004 and August 2005, prior to the time that this system started.

97.     At no point during the period between January 2003 and the present has APL considered the impact that local holidays have on the movement of containers from port to destination and on their return from the point of destination to port. This practice resulted in excess detention charges, for local holidays repeatedly and consistently resulted in a cessation of work by local personnel and concomitant delays in movement of containers that were not caused by the United States government. Accordingly, between January 2003 and the present, APL should not have been assessing detention and reefer maintenance charges on local holidays. Relator estimates that APL charged over $100,000 in detention and reefer maintenance for U.S. holidays and a similar amount for local holidays during March 2004 through August 2005 alone.

98.     The exact increase in the amount billed by APL to DoD for detention and reefer maintenance as a result of APL's knowingly incorrect calculation of "freetime" (i.e., running the detention/freetime "clock" when the U.S. government was not responsible for delay or otherwise

27

1    failing to calculate freetime correctly) is presently unknown to relator but is presently estimated to be

2    in excess of $10 million. A first claim was submitted on or about November 3, 2003, and additional

3
4    claims were submitted pursuant to the Memorandum of Agreement, including, but not limited to, a

5    supplemental claim dated November 21, 2003, a second supplemental claim dated December 30,

6    2003, and a third supplemental claim dated January 26, 2004. These claims pertained to events prior

7    to and including December 2003. Additional claims were submitted in the form of Detention

8    Accruals for January 2004 through at least August 2005. The claims submitted by APL for these
9
10   costs have been paid by SDDC through at least December 2004. The amount overcharged pursuant

11   to this scheme will be established at trial.

12        99.    Maersk has followed the same practice described above with respect to its method of

13   calculating free time during the time period covered by USC-03 and USC-04 . It also has started the

14   calculation of freetime from the date of discharge (i.e., it has started the detention/freetime clock
15
16   upon container discharge and let it run thereafter, whether or not the U.S. government has been

17   responsible for any delays), in knowing violation of the terms of the contract,. In addition, though,

18   Maersk has also knowingly miscalculated freetime by failing to exclude all Saturdays, Sundays and

19   holidays from the calculation of freetime, as required by the contract   Maersk has provided just eight
20
21   days of freetime, which is less than the amount required by the contract. As just one example, in its

22   May 27, 2005 claim, which pertained primarily to March 2005 charges, Maersk calculated detention

23   and reefer maintenance for all the containers listed in the invoice, by starting the clock from the date

24   of discharge and giving just eight days of freetime, then charging detention and reefer maintenance

25   for all days thereafter until containers were returned to port, irrespective of the fact that the United
26
27   States was not responsible for all the delays. Relator is informed and believes that Maersk has been

28                                                28

1 paid by the United States for its false detention and reefer maintenance claims, and that the damages

2 resulting from this practice are in excess of $10 million. Attached as Exhibit E is a spreadsheet

3
4 titled "Final March Detention," which includes Maersk's improper detention and detention related

5 charges (including reefer maintenance) for specific containers in its May 27, 2005 claim.

6 OVERPAYMENTS

7     100.    In or around May and June 2004, APL submitted non-final versions of its invoices

8 for services to SDDC in March and April 2004, respectively, then later submitted final versions of

9
10 the same invoices, but SDDC processed the non-final versions of the invoices and overpaid those

11 invoices. The detention accruals submitted by APL to SDDC for March and April 2004 were for

12 $3,450,752.18 and $4,267,661.44. The corrected invoice amounts were $2,836,567.18 and

13 $3,796,774.44, respectively, in invoices March 2004 (B) and April 2004 (B). The total amounts paid

14
15 on the invoices were $4,035,620.78 and $4,723,334.60, respectively, which translated to

16 overpayments of $584,868.60 for March 2004 and $455,673.16 for April 2004. The payments by

17 SDDC to APL for the March and April 2004 invoices were made via payment modifications P00198,

18 P00222, P00240, and P00318.

19     101.    In or around July 2004, APL submitted an invoice to SDDC for May 2004. The May

20
21 2004 detention accrual was for $4,156,317.22. The total payments ultimately made by SDDC on the

22 invoices as of August 2005 totaled $4,318,863.84, which resulted in an overpayment of $162,546.62.

23 The payments by SDDC to APL for the May 2004 invoice were made via payment modifications

24 P00198, P00222, P00240, and P00318.

25     102.    The total amount overpaid on the March, April and May 2004 invoices was

26
27 $1,203,088.38 ($584,868.60 + $455,673.16 + $162,546.62 = $1,203,088.38).

28 29

103.   As of the date that relator Brown was removed from his position as a Documentation Controller in March 2006, APL had not advised the Government of the overpayments, reimbursed the funds, or credited the funds, despite the fact that it was aware of all three overpayments. Moreover, APL continued to claim funds as due from the United States, after learning that it had been overpaid on the foregoing invoices.

## OVER-BILLING LINEHAUL RATES

104.   The Rate Rules set forth in USC-03 and USC-04 state as follows with regard to linehaul charges: "All drayage and inland rates are for between service. No directional rates will apply under this contract." Accordingly, the linehaul rates paid to APL under both contracts were intended to cover round-trip service by APL from the port to the point of destination and the return of the empty container back to the port.

105.   No provision was made in either contract for picking up another carrier's empty container on the return trip. On frequent occasion, however, between January 2003 and January 2004, drivers working for APL returned from their points of destination in Afghanistan with empty containers owned by Maersk or other carriers. In all such cases, APL assessed a separate round-trip charge for transporting the other carrier's empty container back to port in Pakistan. APL followed this approach between the dates specified with regard to over 350 containers. Attached as Exhibit F is a spreadsheet titled "Exhibit 14", which lists containers impacted by the foregoing billing practices by APL. Also attached as Exhibit G is a spreadsheet titled "Detention Accruals January 2004," which lists containers impacted by the foregoing billing practices by APL and a partial credit for some double-billed amounts.

106.   The foregoing charges constituted double billing, as the other carriers, whose empty

30

containers APL returned, could easily have returned APL's empty containers as part of the round-trip line-haul service those carriers also had to provide. Accordingly, there was no justification for the additional round-trip charge by APL.

107. Even if the other carriers had not been available to pick up APL containers, though, and some charge were appropriate, the amount that APL charged for providing the service was far beyond any amount permissible under the USC-03 and USC-04 contracts.

108. As there was no specific contractual rate in the contracts for one-way transport of other carrier's empty containers, the proper manner of charging for such services (were they, in fact, not already covered) would have been for APL to seek reimbursement of its actual costs from the Contracting Officer pursuant to Federal Acquisition Regulation ("FAR") Section 52.212-4 and Department of Defense FAR Supplement ("DFAR") Section 252.243.7002, both of which were incorporated by reference and set forth in USC-03 and USC-04.

109. FAR 52.212-4 requires that when the United States requires changes in the services provided by a contractor, "[i]f any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer must make an equitable adjustment in the contract price, the delivery schedule or both, and shall modify the contract." But DFAR Section 252.243.7002 also makes clear that "[t]he request shall include only costs for performing the change, and shall not include any costs that already have been reimbursed or that have been separately claimed." It further provides that "[a]ll indirect costs included in the request shall be properly allocable to the change in accordance with applicable acquisition regulations." Id.

110. The actual costs associated with APL transporting other carrier's empty containers

31

1   back to port were only a small fraction of the round-trip line-haul rate they charged DoD for each of

2   the trips. APL billed approximately $1.44 million for transporting other carrier's empty containers

3
4   from Afghanistan back to port in Pakistan between January 2003 and January 2004, but their actual

5   costs were significantly lower than that for providing the services. Accordingly, APL falsely billed

6   the United States for at least the difference between the $1.44 million it billed and the real costs it

7   incurred to provide the services.

8       111.    The foregoing excessive/duplicative charges by APL for transporting other carrier's
9
10  empty containers from Afghanistan back to port in Pakistan were included in APL's November 21,

11  2003 first supplemental claim pursuant to the Memorandum of Agreement.

12                              COUNT I
                (Submission of False Claims in Violation of 31 U.S.C. § 3729(a)(1))
13                              (All Defendants)

14

15      112.    Relator realleges and incorporates paragraphs 1 through 111 as if fully set forth

16  herein.

17      113.    In engaging in the conduct described herein, defendants have knowingly submitted, or
18
19  caused to be submitted to DoD claims for payment which were false.

20      114.    Defendants thus knowingly caused the submission of false claims to the United States

21  in violation of the False Claims Act. The United States was damaged by such false claims in an

22  exact amount to be established at trial.

23

24

25

26

27

28                                    32

1

2

3

COUNT II
(Use of False Statements or Records or Statements
in Violation of 31 U.S.C. § 3729(a)(2))
(All Defendants)

4        115.    Relator realleges and incorporates paragraphs 1 through 111  as if fully set forth

5     herein.

6

7        116.    In engaging in the conduct described above, defendants knowingly participated in the

8     submission of false records and/or statements to the United States regarding, inter alia, services, the

9     cost of services being provided by defendants to DoD, and the allowability of costs submitted to

10    DoD.

11        117.    Defendants thus knowingly used false records or statements to get false or fraudulent

12

13    claims paid or approved by the United States in violation of the False Claims Act.  The United States

14    was damaged by such false claims in an exact amount to be established at trial.

15

16

COUNT III
(Reverse False Claims - 31 U.S.C. § 3729(a)(7))
(All Defendants)

17        118.    Relator realleges and incorporates paragraphs 1 through 111 as if fully set forth

18

19    herein.

20        119.    By engaging in the conduct described above, defendants avoided or reduced

21    obligations owed to the United States.

22        120.    When seeking additional payments from DoD, following the improper receipt of

23    funds described above, defendants knowingly concealed information concerning the offsetting

24

25    reimbursements that were owed to DoD and thus reduced defendants' obligation to the United

26    States.

27

28                                                    33

1    121.    Defendants thus knowingly used false records or statements to reduce or avoid an

2    obligation to pay the United States in violation of the False Claims Act. The United States was

3    damaged by such false claims in an exact amount to be established at trial.

4

5                                    COUNT IV
                    (Conspiracy to Get False Claims Paid - 31 U.S.C. § 3729(a)(3))
6                                  (All Defendants)

7    122.    Relator realleges and incorporates paragraphs 1 through 111 as if fully set forth

8    herein.

9
     123.    Between at least 2003 and the present, APL and Maersk individually and collectively
10

11   agreed amongst themselves to follow consistent billing practices with DoD so as not to draw

12   individual attention to any unlawful practices, and they have maintained consistent practices

13   pursuant to this agreement. The practices APL and Maersk agreed upon are as set forth herein.

14   124.    Defendants thus knowingly conspired to defraud the United States by getting false
15
     claims paid in violation of the False Claims Act. The exact amount of the United States' harm has
16

17   not yet been determined. The precise amount of damages will be ascertained at trial.

18

19   WHEREFORE, plaintiffs/relator pray for judgment against defendants as follows:

20
     1.    On Count I (Submission of False Claims), an order holding each of the defendants
21

22   individually and jointly liable for treble the single damages, to be established at trial, that they or

23   their affiliated entities caused, penalties of $11,000 for each false claim, the number of which is to be

24   established at trial, plus such other relief as this Court deems just and appropriate.

25   2.    On Count II (Use of False Statements or Records), an order holding each of the
26
     defendants individually and jointly liable for treble the single damages, to be established at trial, that
27

28                                           34

they or their affiliated entities caused, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

3.    On Count III (Reverse False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages, to be established at trial, that they or their affiliated entities caused, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

4.    On Count IV (Conspiracy to Submit False Claims), an order holding each of the defendants individually and jointly liable for treble the single damages, to be established at trial, that they or their affiliated entities caused, penalties of $11,000 for each false statement or record, the number of which is to be established at trial, plus such other relief as this Court deems just and appropriate.

5.    For the payment of reasonable attorneys' fees, costs, and expenses per the False Claims Act.

Dated: ___9/7___, 2007

LAW OFFICES OF PAUL D. SCOTT

BY:    _____

PAUL D. SCOTT
Attorney for Relator Brown

35

## JURY DEMAND

Relator Brown hereby demands trial by jury.

1   **PROOF OF SERVICE BY MAIL AND HAND-DELIVERY**

2       I, the undersigned, declare:

3       I am over the age of 18 and not a party to this cause. I am employed in the City and County of

4

5   San Francisco. My business address is 201 Filbert Street, Suite 401, San Francisco, California

6   94133.

7       On the date set forth below, I caused to be served a copy of the attached **SECOND-**

8   **AMENDED COMPLAINT AND JURY DEMAND** on the United States, by causing true and

9   correct copies thereof to be sent in envelopes on **September _7_, 2007** by mail to:

10

11  Andrew Steinberg
12  Civil Fraud Section
    U.S. Department of Justice
13  9th Floor
    601 D Street, N.W.
14  Patrick Henry Building
    Washington, D.C. 20004

15

16  and by hand-delivery to:

17  Sara Winslow
    Assistant United States Attorney
18  U.S. Attorney's Office
    Northern District of California
19  450 Golden Gate Avenue
    San Francisco, California 94102.

20

21      I declare under penalty of perjury of the laws of the laws of the United States that the

22  foregoing is true and correct.  Executed on **September _7_, 2007** at San Francisco, California.

23

24  _____
    Elizabeth Terzees
25

26

27

28                                  37